## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMBER COLSTON, WILLIS BRAMWELL and ROSEANN BLESSING, individually and on behalf of all others similarly situated,  )<br><br>Plaintiffs,  )<br>v.  )<br><br>AMERITAS HOLDING COMPANY, THE BOARD OF DIRECTORS OF AMERITAS HOLDING COMPANY, THE AMERITAS 401(K) RETIREMENT PLAN COMMITTEE and JOHN DOES 1- 30.  )<br><br>Defendants.  ) | CIVIL ACTION NO.: _____ |

## CLASS ACTION COMPLAINT

Plaintiffs, Amber Colston, Willis Bramwell and Roseann Blessing ("Plaintiffs"), by and through their attorneys, on behalf of the Ameritas 401(k) Retirement Plan ("401(k) Plan"), themselves and all others similarly situated, state and allege as follows:

### I.     INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Ameritas Holding Company ("Ameritas" or "Company") and the Board of Directors of Ameritas Holding Company and its members during the Class Period ("Board")[1] and the Ameritas 401(k) Retirement Plan Committee and its members during the Class Period ("Committee").

---

[1] As will be discussed in more detail below, the Class Period is defined as July 27, 2017 through the date of judgment ("Class Period").

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees*," *infra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      The duty of loyalty also includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.  As noted in Advisory Opinion 88-16A, issued by the United States Department Of Labor ("DOL"):

> …in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.  A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

1988 WL 222716, at *3 (Dec. 19, 1988).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and

implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[2]

7.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.     The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Northwestern Univ.*,  142 S.Ct. 737, 741 (2022).

9.     At all times during the Class Period, the Plan had at least $500 million dollars in assets under management.  At the Plan's fiscal year end in 2021 and 2020, the Plan had over $779 million dollars and $708 million dollars, respectively, in assets under management that were/are

---

[2] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

3

entrusted to the care of the Plan's fiduciaries. The December 31, 2020 and December 31, 2021 form 5500 filing of the Ameritas 401(k) Retirement Plan ("2020 and 2021 5500").

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  In 2016, only 0.1 percent (567 of 560,288) of 401(k) plans in the country had between $500 million and $1 billion in assets under management.[3]  The same percentage remained at the start of the Class Period in 2017 (*i.e.* 623 of 569,257 plans had assets between $500 million and $1 billion).[4]  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. §

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 at Ex. 1.2, p. 7., available at
https://www.ici.org/system/files/attachments/19_ppr_dcplan_profile_401k.pdf.

[4] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 at Ex. 1.2, p. 13., available at
https://www.ici.org/system/files/attachments/20_ppr_dcplan_profile_401k.pdf.

1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence/loyalty (Count One) and failure to monitor fiduciaries (Count Two).

## IV.   JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## V.  PARTIES

### Plaintiffs

17.     Plaintiff, Amber Colston ("Colston"), resides in Cincinnati, Ohio. During her employment, Plaintiff Colston participated and invested in the Plan investing in the options offered by the Plan that are challenged in this lawsuit and was subject to the high cost annuity based product along with its excessive asset based charges. Plaintiff Colston specifically invested in the T.Rowe Price Retirement target date sub-advised account returns which were subject to the

excessive charges described herein. She suffered injury to her Plan account from the excessive expense of these funds which are part of a costly retail level annuity product offered by her employer at the time, Ameritas, who also, not coincidently, managed the Plan and acted as recordkeeper. In addition, Plaintiff Colston suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the expensive sub-advised funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Colston suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees, as alleged below. *Id*.

18.     Plaintiff, Willis Bramwell ("Bramwell"), resides in Tabernash, Colorado. During his employment, Plaintiff Bramwell participated and invested in the Plan investing in the options offered by the Plan that are challenged in this lawsuit and was subject to the high cost annuity based product along with its excessive asset based charges. Plaintiff Bramwell specifically invested in the T.Rowe Price Retirement 2030 target date sub-advised account returns from which were subject to the excessive charges described herein. He suffered injury to his Plan account from the excessive expense of these funds which are part of a costly retail level annuity product offered by his employer at the time, Ameritas, who also, not coincidently, managed the Plan and acted as recordkeeper. In addition, Plaintiff Bramwell suffered injury to his Plan account by having to pay for his share of consulting fees to maintain any of the expensive sub-advised funds in the Plan

whether specifically identified herein or not, as described below. Further, Plaintiff Bramwell suffered injury to his Plan account by the fact that his claim against his share of investments in the Plan is diminished by the expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees, as alleged below. *Id*.

19.      Plaintiff, Roseann Blessing ("Blessing"), resides in Florence, Kentucky. During her employment, Plaintiff Blessing participated and invested in the Plan investing in the options offered by the Plan that are challenged in this lawsuit and was subject to the high cost annuity based product along with its excessive asset based charges. Plaintiff Blessing specifically invested in the MFS Value, Class R3 sub-advised account returns which were subject to the excessive charges described herein and above. She suffered injury to her Plan account from the excessive expense of these funds which are part of a costly retail level annuity product offered by her employer, at the time, Ameritas who also, not coincidently, managed the Plan and acted as recordkeeper. In addition, Plaintiff Blessing suffered injury to her Plan account by having to pay for her share of consulting fees to maintain any of the expensive sub-advised funds in the Plan whether specifically identified herein or not, as described below. Further, Plaintiff Blessing suffered injury to her Plan account by the fact that her claim against her share of investments in the Plan is diminished by the expensive funds which were left languishing in the Plan whether they are specifically identified herein or not. Under IRS regulations, a participant in any retirement plan regulated by ERISA, always maintains a claim in the form of an undivided interest against a plan's

trust for his or her share of the investment. *See*, 26 CFR § 1.414(I)-1. The amount of this undivided interest is diminished for all participants when a plan is paying excessive fees, as alleged below. *Id*.

20.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct.  Further, Plaintiffs have standing because their claims against their share of investments in the Plan are diminished by the underperforming funds and the excessively expensive retail level annuity structure offered by the Plan, whether they are specifically identified herein or not.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, what a competitive expense ratio is for funds in a retirement plan and how target date funds and other funds in a retirement plan should perform as compared to their peers and benchmarks) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

22.     Ameritas is a named fiduciary of the Plan with a principal place of business being 5900 O Street, Lincoln, Nebraska. 2021 form 5500 of the Ameritas 401(k) Retirement Plan ("2021 5500"). According to its website, Ameritas is a provider of investment and insurance based products with over 5.3 million customers[5].

---

[5] https://www.ameritas.com/about

23.     Ameritas appointed the Committee to, among other things, to select and monitor Plan investments and fees. The Ameritas 401(k) Plan Investment Policy Statement effective date May 2016 ("IPS") at 2. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

24.     Accordingly, Ameritas during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

**Board Defendants**

25.      Ameritas, acting through its Board, appointed the Committee to, among other things, select and monitor Plan investments and fees. IPS at 2. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.     Accordingly, each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

27.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

28.     As discussed above, Ameritas and the Board appointed the Committee to, among other things, ensure that the investments available to the Plan's participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. IPS at 2.

29.     The IPS goes on to further define the Committee's role in selecting and monitoring the investment choices and expenses associated with the Plan as required "to…[c]ontrol administrative and management costs …" IPS at 3.

30.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the Plan's assets.

31.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**<u>Additional John Doe Defendants</u>**

32.     To the extent that there are additional officers, employees and/or contractors of Ameritas who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Ameritas officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS[6]

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants.  *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims).  ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

33. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between July 27, 2017 through the date of judgment (the "Class Period").

34. The members of the Class are so numerous that joinder of all members is impractical. The 2021 Form 5500 lists 3,537 Plan "participants with account balances as of the end of the plan year." 2021 Form 5500 at 2.

35. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

36. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duty of prudence and loyalty by engaging in the conduct described herein;

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.      Whether the Company and Partnership Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of monetary relief.

37.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

38.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

39.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   THE PLAN

40.     The Plan is a defined contribution plan covering substantially all eligible employees of Ameritas. 2021 Auditor Report for the Ameritas 401(k) Retirement Plan ("2021 Auditor Report") at 7. More specifically, the Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. *Id.* Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

41.     In general, the Plan covers all employees of Ameritas from the first day of employment. *Id.*

### *Contributions*

42.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

43.     With regard to employee contributions, participants can elect to make annual pre-tax and Roth contributions subject to Internal Revenue Service ('IRS') limitations. *Id.* With regard to contributions made by the employer, such contributions are based on no more than 6% of an employee's total compensation. *Id.*

44.     Like other companies that sponsor 401(k) plans for their employees, Ameritas enjoys both direct and indirect benefits by providing matching contributions to the Plan's participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

45.     Ameritas' employees benefit in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

46.     Given the size of the Plan, Ameritas likely enjoyed a significant tax and cost savings from offering a match.

*Vesting*

47.     Participants are automatically vested in any contributions they made to their accounts themselves. *Id*. However, matching contributions made by Ameritas are subject to a three year vesting schedule. *Id.*

*The Plan's Investments*

48.     In theory, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance and fees at least quarterly. IPS at 2. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

49.     Several funds were available to the Plan's participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

50.     At the Plan's fiscal year end in 2021 and 2020, the Plan had over $779 million dollars and $708 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. 2021 Auditor Report at 6.

**Payment of the Plan's Expenses**

51.     During the Class Period, administrative expenses which included the maintenance of the associated variable annuity contract were paid by using Plan assets. Plan Participant Fee Disclosure, Ameritas Life Insurance Corp, as of June 14, 2022 ("2022 Fee Disclosure") at 6.

## VIII.  THE PLAN'S FEES AND PERFORMANCE DURING THE CLASS PERIOD WERE UNREASONABLE

### A.  The Totality of the Circumstances Demonstrates that the Plan's Fiduciaries Failed to Administer the Plan in a Prudent Manner

52.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

53.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S.Ct. at 741.

54.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery.  *See, Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without

pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

55.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs wrote to the Defendants to request, among other things, the Committee's meeting minutes.  This request was made on June 16, 2022. By letter dated July 15, 2022, Ameritas denied the Plaintiffs' request for meeting minutes.

56.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

57.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

58.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services…"  DOL 408(b)(2) Regulation Fact Sheet.

59.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

60.     Here, Defendants did not engage in a prudent process in evaluating investment management fees and the prudence of the Plan's funds.

**(B)     Defendants Breached Their Fiduciary Duties by Using an Expensive Retail Level Insurance Based Annuity Product to Deliver Investments for the Plan**

61.     Throughout the Class Period, Defendants' actions were rife with conflicts of interest and disloyalty toward Plan participants.  In particular, the Plan's Sponsor, Ameritas, and/or its affiliates, (hereinafter "Ameritas"), received excessive and unreasonable compensation through: (1) excessive annuity contract management fees paid directly to Ameritas, its affiliates and/or third parties, (2) excessive annuity investment management expense paid directly to Ameritas, its affiliates and/or third parties; and (3) excessive fees for, but not limited to, services such as actuarial services and similar reports.

62.     In order to provide for these revenue streams, Defendants larded the Plan with excessive fees and charges paid directly to Ameritas, its affiliates and/or third parties to maintain the annuity contract. Forbes Magazine, a well-respected publication of the financial industry, described insurance based group annuity products as follows:

> Among 401(k) plans designed for small companies, the total fees on some group annuities can top $1,000 per participant every year, or three times what low-cost 401(k) plans cost, according to data provider 401kSource. Have second thoughts after signing up and you'll discover that buying a group annuity is like joining the Sopranos. … Some insurers, including New York Life, refuse to offer group annuities. Deanna Garen, a managing director for the firm, points out that, in theory, retirement savings plans with annuitization features are a great idea. Unfortunately, says Garen, the ones

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

on the market are too confusing and costly. "They just haven't evolved to the point where there are sensible fee structures," she says.

*See*, https://www.forbes.com/forbes/2009/0713/group-annuity-aig-retirement-plans-from-hell.html#77641d07219f.

63.     With regard to the excessive charges in this Plan, according to the Plan's own variable annuity contract: "[a] contract management charge is a charge by the Company based on each Participant Investment Account, the Non-Vested Funds Account and the Unallocated Account." Ameritas Group Annuity Contract, Contract No. 60001, effective date October 1, 2000 ("Annuity Contract") at 8. The Annuity Contract goes on to state: "[t]he charge is determined based on an annual percentage rate applied to the accumulated value in those accounts. … [t]his rate shall not exceed 2.50% annually ["Contract Management Charge"]. *Id.* The Plan consists of three separate accounts, namely, a Guaranteed Investment Account, Ameritas Retirement Equity Account and Separate Account D. The Contract Management Charge applies to all three accounts, and, thus, confirms that these asset based charges are applied against all assets in the Plan. *See,* Annuity Contract at 8 (applicable to the Guaranteed Investment Account), at 9 (applicable to the Ameritas Retirement Equity Account ("AREA")) and at 13 (applicable to Separate Account D).

64.     In addition, because there are only Participant Investment Accounts, Non-Vested Accounts and Unallocated Accounts in this Plan, it is yet further confirmation that the charges described above are a total asset based charge against all assets in the Plan. The Plan's 2022 Fee Disclosure further confirms that these charges are applied against all assets in the Plan. The Plan's 2022 Fee Disclosure provides: "[o]n a monthly basis, Ameritas reviews the amount of fees collected through its asset charge … ." The fact that Ameritas itself refers to its charges as asset charges is further support for the fact that the charges listed above are applied against all assets in the Plan which in 2021 totaled more than $779 million dollars.

18

65.     Even if these charges were half of the advertised amount of 2.50% or 1.25% against all assets in the Plan, the fee would be astronomical at only half. Multiplying the total assets in 2021 by 0.0125 leaves a total Contract Management Charge of more than 9 Million dollars and this is only for one year of the Class Period. That 9 Million dollars would have translated to $2,544.53 (*i.e.*, $9m divided by 3,537, the number of participants in 2021).

66.     By way of comparison, the average ***total*** plan cost for a plan with assets between $500 million and $1 billion was .45 % of assets in 2009 and .37% in assets in 2019.[9] "Total Plan cost is Brightscope's measure of the total cost of operating the 401(k) plan and includes asset-based investment management fees, asset-based administrative and advice fees, and other fees (including insurance charges) from the Form 5500 and audited financial statements of ERISA covered 401(k) plans. Total plan cost is compute."

67.     Comparing the Plan's charges under the Annuity contract to total plan costs of comparably-sized plans is a useful exercise because it shows that the Annuity contract throughout the Class Period charged nearly three times more for Plan services than the average plan its size. Given that total plan costs decreased in the decade between 2009 and 2019, it evinces a pattern of decreasing costs that makes the Plan's current annuity charges more egregious.

68.     To make matters worse, the AREA and Separate Account D which together harbored more than $624 Million dollars of the total $779 Million dollars in the Plan in 2021, are subject to an Investment Management Expense charge which is not to exceed .50% of total assets in those two accounts. Again, even if this charge were only half of the maximum, or .25%, these additional charges are astronomical especially when added to the already astronomical Contract

---

[9] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 4.1, p. 49., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

Management Charge. In 2021, at .25%, this additional charge would be $1,560,000.

69.     The Annuity Contract lumps several services provided in exchange for the Contract Management Charge of 2.5% and the Investment Management Charge of .5%, discussed above. This makes comparison of the Annuity Contract charges to total plan charges of other plans, which incudes arguably more services, appropriate.

70.     However, it's difficult to understand why the Plan is incurring such high charges. The primary charges any retirement plan might incur would be for recordkeeping, advisory services, accounting and legal.

71.     The Plan entered into a recordkeeping contract with UNIFI in 2008, where UNIFI is paid $2,250 per year and a $10 per participant fee. In 2017, with 3,464 participants that $10 per participant fee is under $35,000. *See*, Administrative Services Agreement between Ameritas and UNIFI Companies Retirement Plans dated  December 22, 2008 ("Administrative Services Agreement") at 3. In 2011, UNIFI became an affiliated entity of Ameritas and by 2021 Ameritas Life Insurance Company and/or its affiliates was reported on the Plan's 5500 filing as the recordkeeper and charged  a fee of $110,685 for these services[10].

72.      Similarly, the charges incurred for advisory fees don't account for the estimated $10M dollars extracted from the Plan throughout the Contract Management Charge and the Investment Management Expense.  In 2016, the Plan hired the advisory firm of FEG for $150,000 per year[11]. *See*, Retirement Plan Investment Management Agreement dated August 8, 2016 at

---

[10] Again, Ameritas being the Plan's recordkeeper sets the stage for potential conflicts of interest and disloyal conduct in assessing fees. If the Plan used a larger part of the Contract Management Fee and/or the Investment Management Fee for recordkeeping, we reserve the right to challenge the total charge for recordkeeping including those fees listed in this paragraph.

[11] If the Plan used a larger part of the Contract Management Fee and/or the Investment Management Fee for advisory, we reserve the right to challenge the total charge for advisory including those fees listed in this paragraph.

Schedule A. Another primary expense for retirement plans are accounting fees and legal fees. However, it's clear, accounting fees would not make up the remainder of the nearly $10M or more taken by Ameritas and/or its affiliates.

73.     Another area of expense for most retirement plans are investment management fees. But here, investment management fees are already paid by the underlying mutual funds that make up the Plan. *See,* 2022 Fee Disclosure at 6 and 7. There's simply no reason why the $10M or more taken by Ameritas and/or its affiliates would be needed to pay for additional investment management fees as suggested by the Annuity Contract when those fees are already paid by the underlying mutual fund. Annuity Contract at 13. Such a fee would be duplicative and is an unnecessary part of a Plan of this size able to negotiate for a Plan without an underlying annuity product.

74.     Given the recordkeeping fees, the advisory fees and the fact that investment management fees are already paid for, there is no reasonable rationale for Ameritas and/or its affiliates to be paid $10M dollars (estimated at only half of the 2.5% total asset charge) per year during the Class Period. This fee is clearly excessive.

75.     As can be seen in the paragraphs above, the choice of an annuity-based product for one of the largest Plan's in America, had disastrous consequences for Plan participants because these excessive charges diminished their savings for retirement. A more appropriate method for maintaining such a large plan would be to offer mutual funds for investment directly in the Plan rather than through a complicated and non-transparent fee structure that annuity products are known for. It was imprudent for the Defendants not to have done so.

76.     As fiduciaries to the Plan, the Defendants were and are obligated to ensure that the Plan is paying no more expense than is reasonable. Clearly, the Plan fiduciaries fell well short of

this goal. A reasonable amount for plan services should be determined as if the Plan were not an annuity product. If that were done, it would become clear that the only fees the Plan should be incurring are for recordkeeping and advisory, and a reasonable amount for accounting and legal. The Plan has already negotiated fees for recordkeeping and advisory services under $150,000 each which makes clear that the Plan should not be incurring fees of nearly $10M dollars per year. Since the investment management fees are already paid for by the underlying mutual funds, it's clear the excessive $10M charge should not be considered to be part of it. However, there seems to be no other explanation for why the estimated amount of half of the 2.5% charge, or more than $10M, is being taken by Ameritas and/or its affiliates other than to enrich the coffers of Ameritas and/or its affiliates. Once reasonable fees are determined (which can be done one way by looking at the average total plan costs of similarly-situated plans), all other fees taken by the Plan during the Class Period should be returned to the Plan and its participants, with interest.

**(C)    Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

77.    The structure of this Plan is rife with potential conflicts of interest because Ameritas and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.  Here, the Plan's Trustee is Ameritas or an affiliate of Ameritas, Ameritas or an affiliate of Ameritas performs the recordkeeping services for the Plan while Ameritas or an affiliate acts as the Plan Sponsor and Administrator.

78.    This conflict of interest is laid bare in this case where a much lower-cost plan structure was available to the Plan, namely a non-annuity based 401(k), but was not chosen by the Plan simply because Ameritas or its affiliates is in the annuity business and would be able to reap extensive profits form the Plan as long as the Plan had this expensive retail structure.

79.    There appears to be no reasonable justification for the millions of dollars collected

from Plan participants that ended up in Ameritas' coffers.

80.     The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Ameritas and its affiliates and ensure that the fees charged by Ameritas and its affiliates were reasonable and in the best interests of the Plan and its participants.   Clearly, Defendants failed this aspect of their fiduciary duties.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Committee)

81.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

82.     At all relevant times, the Committee and its members during the Class Period ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

83.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).   These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

84.     The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint such as selecting a retail based and unnecessarily expensive annuity based product for the Plan which cost plan participants millions in their

retirement savings. There's no justifiable reason for having done so other than said selection benefited Ameritas and/or its affiliates.

85.    The failure to engage in an appropriate and prudent process resulted in saddling the Plan and its participants with excessive fees that cost the Plan's participants potential retirement benefits.

86.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to investment return damages.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

87.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

88.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Ameritas and the Board Defendants)

89.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

90.     Ameritas and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

91.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

92.     The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

93.     The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;
>
> (b)     failing to monitor the processes by which the Plan's investments were evaluated; and
>
> (c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent and poorly performing investments

within the Plan all to the detriment of the Plan and Plan participants' retirement savings.

94.     As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

95.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's

assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of the Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: July 27, 2023                    **CAPOZZI ADLER, P.C.**

                                        /s/ *Donald R. Reavey*
                                        Donald R. Reavey, Esquire
                                        PA Attorney ID #82498
                                        (*Admitted in the Federal District of Nebraska*)
                                        2933 North Front Street
                                        Harrisburg, PA 17110
                                        Email: donr@capozziadler.com
                                        Telephone:  (717) 233-4101
                                        Fax: (717) 233-4103

                                        /s/ *Mark K. Gyandoh*
                                        Mark K. Gyandoh, Esquire
                                        PA Attorney ID # 88587
                                        (*Admitted in the Federal District of Nebraska*)
                                        **CAPOZZI ADLER, P.C.**
                                        312 Old Lancaster Road
                                        Merion Station, PA 19066
                                        Email: markg@capozziadler.com
                                        Telephone:  (610) 890-0200
                                        Fax: (717) 233-4103

                                        Counsel for Plaintiffs and the Putative Class